# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **BILLY CHARNER MARLOW,** ) | |
| ) | |
|    **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) |    **6:09-CV-00464-KOB** |
| **MICHAEL J. ASTRUE,** ) | |
| **COMMISSIONER, SOCIAL** ) | |
| **SECURITY ADMINISTRATION,** ) | |
| ) | |
|    **Defendant.** ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 18, 2006, the claimant, Billy Charner Marlow, applied for a period of disability insurance benefits under Title II of the Social Security Act. On January 18, 2006, the claimant also applied for supplemental security income under Title XVI of the Social Security Act. The claimant alleges disability commencing on May 10, 2005. (R.15). The Commissioner denied the claim initially on April 28, 2006. (R.33). The claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ), and the ALJ held a hearing on July 20, 2007, in Cullman, Alabama. (R.15). In a decision dated February 4, 2008, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for supplemental security income. (R.28). On September 24, 2008, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R.5). The claimant has exhausted his administrative remedies, and

1

this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The court notes that the claimant did not present a specific issue or issues for the court's review. However, after reviewing the claimant's brief, the court believes that the claimant presents the following issue for review: whether the ALJ's decision regarding the claimant's disability is supported by substantial evidence. Furthermore, even though not specifically set forth by the claimant, the court also considers whether the ALJ properly applied the three-part pain standard, and whether the ALJ properly considered the claimant's denial of benefits based on the claimant's failure to comply with prescribed treatment.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five step, sequential evaluation process:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When attempting to establish disability through his own testimony of pain or other subjective symptoms, a claimant must satisfy two parts of a three-part pain standard. The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to

the alleged pain. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added); *see also Kelly v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

In *Lucas v. Sullivan,* 918 F.2d 1567 (11th Cir. 1988), and *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988), a claimant was denied benefits because of a failure to comply with prescribed treatment. In both cases, the ALJ erred by not considering the reasons for the claimant's compliance. The Eleventh Circuit held that noncompliance of treatment could be excused when it was the result of an inability to afford treatment or other circumstances beyond the claimant's control. *See Lucas*, 918 F.2d at 1574; *Dawkins*, 848 F.2d at 1213-14. More specifically, the court in *Dawkins* noted that a claimant's non-adherence may be excused for good reason, such as inability to speak English or afford treatment, holding religious beliefs that conflict with treatment, or if the treatment is extremely risky or would involve amputation of an extremity. *Dawkins*, 848 F.2d at 1212; *see also* 20 C.F.R. § 416.930.

## V. FACTS

The claimant was forty-three years old at the time of the administrative hearing. (R. 431). He has a high school education and completed one quarter of vocational training in heating and air conditioning at Wallace State. (R. 434). His past work experience includes employment in the heating and air conditioning industry as both a sheet metal mechanic and a service technician. (R. 438). The claimant alleges that he is unable to work because of panic attacks, and pain in his shoulders, back, and ribs. (R. 439, 442).

*Physical Limitations*

On January 5, 2004, the claimant presented to Dr. Steven Fuller, an orthopedic surgeon, for

4

an orthopedic evaluation. The claimant complained of right shoulder pain that had lasted for more than ten years. Dr. Fuller diagnosed the claimant with a right shoulder impingement with probable rotator cuff tear. Dr. Fuller prescribed claimant pain medication after administering a subacromial injection in the claimant's right shoulder. (R. 118-119).

On January 19, 2004, the claimant again presented to Dr. Fuller complaining of right shoulder pain. Dr. Fuller noted that claimant received minimal improvement from the subacromial injection. Dr. Fuller prescribed claimant Lortab for pain. (R. 116-117).

On March 31, 2004, Dr. Robert Wilkinson, a physical medicine and rehabilitation specialist, examined the claimant. The claimant complained of right shoulder pain, and Dr. Wilkinson noted that Lortab was controlling the claimant's pain. Dr. Wilkinson prescribed Percocet for the claimant's pain. (R. 158-159).

On May 3, 2004, Dr. Fuller examined the claimant, and Dr. Fuller noted that the claimant complained of pain in his right shoulder. After reviewing the claimant's magnetic resonance imagine (MRI), Dr. Fuller scheduled the claimant for right rotator cuff repair. (R. 114-115). On May 11, 2004, Dr. Fuller performed right subacromial decompression with rotator cuff repair. Dr. Fuller performed the surgery after "conservative treatment without resolution of [patient's] symptoms." Dr. Fuller did not note any complications during surgery. (R. 109).

On May 24, 2004, the claimant presented to Dr. Fuller for a post-operative follow-up appointment. Dr. Fuller noted that the claimant "felt immediate relief" after surgery. (R. 113). On June 21, 2004, Dr. Fuller again examined claimant on a follow-up visit, noting that the claimant's right shoulder was sore. Dr. Fuller advised claimant that he could begin "physical therapy for active

assisted range of motion."[1] (R. 111).

On July 21, 2004, the claimant presented to Dr. Wilkinson for a follow-up appointment. Claimant complained of chronic shoulder pain, and Dr. Wilkinson discussed MRI and surgical options with the claimant. (R. 157).

On September 8, 2004, Dr. Wilkinson examined the claimant, noting chronic right shoulder pain. Dr. Wilkinson also noted that claimant was "still not sleeping well." In completing his "Medical Visit Questionnaire," the claimant indicated an average pain level of three on a scale of one to ten (R. 154-55). On a October 5, 2004 visit to Dr. Wilkinson's office, the claimant indicated on his "Medical Visit Questionnaire" that his average level of pain was six. Dr. Wilkinson again noted chronic right shoulder pain and right rotator cuff injury. (R. 152-53).

On November 10, 2004, December 8, 2004, January 26, 2005, and February 25, 2005, the claimant presented to Dr. Wilkinson for follow-up visits. Dr. Wilkinson noted that the claimant had chronic right shoulder pain and right rotator cuff injury. Dr. Wilkinson prescribed pain medication at these visits. (R. 144-151). On March 28, 2005, April 20, 2005, and May 18, 2005, Dr. Wilkinson examined the claimant and noted that the claimant had chronic right shoulder pain and right rotator cuff injury, as well as anxiety. Dr. Wilkinson prescribed Roxicodone and Xanax at these visits for the claimant's pain and anxiety, respectively. (R. 137-143). On June 15, 2005, July 15, 2005, August 15, 2005, September 12, 2005, October 10, 2005, and November 7, 2005, Dr. Wilkinson examined the claimant and noted chronic left shoulder pain and left rotator cuff injury. Dr. Wilkinson

---

[1] This court notes that no physical therapy medical records are included as part of the record. Therefore, no records are before this court to indicate that the claimant received physical therapy treatment after his shoulder surgery.

prescribed Roxicodone and Xanax at these follow-up visits.[2] (R. 121-136).

On December 22, 2005, Dr. Ronald T. Y. Moon, a physical medicine and rehabilitation specialist, examined the claimant. In his initial evaluation of the claimant, Dr. Moon noted that claimant reported a pain level of six on a one to ten scale. Dr. Moon noted that the claimant had degenerative disc disease, psychosocial issues, and sleep disturbance. After this initial evaluation, Dr. Moon recommended physical therapy, a home exercise program, and a supervised community fitness program. Furthermore, Dr. Moon noted that "[t]he patient understands that *compliance is crucial* for effective treatment." (R. 209-215) (emphasis in original).

On January 19, 2006, February 16, 2006, and March 16, 2006, the claimant presented to Dr. Moon for follow-up appointments. At each appointment, Dr. Moon recommended that the claimant complete six levels of home exercise program instruction. Dr. Moon also evaluated the claimant's medications at each appointment. Dr. Moon adjusted those medications, Roxicodone and Klonopin, accordingly. (R. 200-215). No evidence of record exists to demonstrate whether the claimant completed any home exercise programs.

On April 6, 2006, Dr. Dinesh R. Gandhi, a consulting physician, examined the claimant. Dr. Gandhi noted that claimant reported a pain level of five or six on a scale of one to ten. Dr. Gandhi also concluded that claimant has anxiety attacks and is depressed, but claimant "is currently on medication," which was Klonopin. (R. 216-17).

On April 27, 2006, Dr. Frank J. Nuckols, a consulting physician, performed a "Psychiatric

---

[2] According to the claimant's testimony at the hearing, Dr. Wilkinson committed suicide, and the claimant had to find another medical provider. The staff at Dr. Wilkinson's office recommended Dr. Ronald T. Y. Moon, who practices in Birmingham, Alabama. (R. 445-46).

Review Technique" and "Mental Residual Functional Capacity Assessment." (R. 220-237). Dr. Nuckols determined that claimant has "depression along with chronic pain" as the claimant's medically determinable impairment. (R. 223). Furthermore, Dr. Nuckols determined that claimant has anxiety attacks. (R. 225). According to Dr. Nuckol's assessment, the claimant only has a moderate degree of limitation in maintaining concentration, persistence, or pace. (R. 230). Dr. Nuckols concluded that the claimant's "[m]ental allegations are partially credible however . . . severity alleged is not supported by function reports." (R. 232). In terms of the workday, Dr. Nuckols found that claimant can complete an "8 hour work day without excessive breaks or frequent supervision." (R. 236).

On May 11, 2006, the claimant presented to Dr. Moon for a follow-up appointment. The claimant complained of right shoulder pain. Dr. Moon noted that the claimant reported an average level of pain of six on a scale of one to ten. (R. 310-12).

On May 15, 2006, Dr. Moon completed a "Physical Functional Assessment," "Clinical Assessment of Pain," and "Clinical Assessment of Fatigue/Weakness." Dr. Moon completed these three forms, and he indicated on every form that the responses were "per patient." The assessments indicate that "[p]ain is present, but does not prevent functioning in everyday activities or work." In addition, Dr. Moon noted that the claimant does not experience any side effects from his prescription medication whatsoever. Dr. Moon indicated on the Clinical Assessment of Pain, which was completed based on the patient's responses, that the patient's medical condition would cause absences at a rate of more than four times per month. (R. 247-249).

On May 18, 2006, Dr. Alan D. Blotcky, a psychologist, interviewed the claimant and

prepared a "Psychological Evaluation Report" of his findings. Dr. Blotcky administered the Wechsler Adult Intelligence Scale III (WAIS-III) and found that the claimant is in the low average range of intellectual abilities. Dr. Blotcky also administered a Beck Depression Inventory and determined that the claimant's score "is indicative of mild depression." Dr. Blotcky concluded that the claimant "needs to be involved in psychiatric treatment for his panic disorder and adjustment disorder with depressed mood." Dr. Blotcky found that the claimant needs to be under the care of a psychiatrist and psychologist, and the treatment plan should include both medication and individual counseling. (R. 252-54). This court notes that no evidence in the record shows that the claimant has ever been treated by a mental health professional. Furthermore, Dr. Blotcky examined the claimant at his attorney's request subsequent to the ALJ hearing, and in preparation for his appeal to this court.

On June 6, 2006 and July 6, 2006, the claimant presented to Dr. Moon for follow-up visits. The claimant's chief complaints on these dates were pain in his bilateral shoulder and right elbow. (R. 301-309). Between the dates of August 3, 2006 and November 20, 2007, Dr. Moon examined the claimant almost once a month. Dr. Moon noted on each visit that the claimant had bilateral shoulder, right elbow, and neck pain. At each visit, Dr. Moon prescribed Roxicodone and Klonopin for the claimant's pain and anxiety, respectively. (R. 263-300, 314-19, 321-29, 333-36, 346-57).

During one of the claimant's aforementioned appointments with Dr. Moon, he ordered an MRI scan of the claimant's cervical spine. The claimant underwent the MRI on September 5, 2006. The results from the MRI revealed that claimant has "[m]ild cervical spondylosis" (a disorder in which there is abnormal wear on the cartilage and bones of the neck) with "[n]o acute abnormality demonstrated." (R. 252-54).

9

On September 6, 2007, Dr. John R. Haney, a psychologist, interviewed the claimant and performed a WAIS-III assessment. Dr. Haney found that the claimant is in the "low average range of intellectual functioning, and corresponded to the nineteenth percentile." Dr. Haney also concluded that the claimant's "ability to function in his previous job appeared moderately impaired by the patient's physical and emotional limitations." Dr. Haney's diagnoses for the claimant included major depressive disorder and pain disorder. (R. 337-39).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 40). At the hearing, the claimant testified that he has pain in his neck, shoulders, and arms. He testified that the medication he takes keeps the pain at a level of five or six. On the day of his ALJ hearing, he complained of shoulder pain after sitting for an extended period of time. (R. 447).

The claimant testified that he only drives on a "very limited" basis, but he had driven his daughter to daycare the day before the hearing. On the day of the ALJ hearing, the claimant's wife drove him. (R. 432).

On a typical day, the claimant testified that he wakes up between 3:00 and 5:00am. He stated that he goes to bed between 9:00 and 9:30pm. The claimant testified that within the first hour of going to sleep, he "wake[s] up and [his] arms will be numb." During the day, the claimant indicated that he has to lie down or recline during the day, especially after waking up so early. Between the hours of 8:00am and 5:00pm, he testified that he lies down or reclines for "[p]robably 2 to 3 hours." The claimant stated that the reasons for lying down or reclining are because he is sleepy and because

of the pain. (R. 435-37).

The claimant stated at the hearing that he does very little housework. He can wash a few dishes and plates, but not the heavier dishes. He indicated that he does not prepare any meals. As far as yard work, the claimant testified that he in unable to perform such tasks because "[i]t just causes great pain." The claimant stated that the pain is "in [his] shoulders and in [his] sides, [his] rib area." The claimant testified that he no longer attends his daughter's school or sports activities. He also stated that he is unable to go shopping or to the grocery store. (R. 435-36).

The claimant testified that he takes care of his personal needs without assistance, and those needs include bathing, dressing, and shaving. The claimant also stated that he watches television and reads books. However, he claimed that he cannot read a book for an extended period of time because his arms "get real tired." The claimant testified that he is unable to do any outdoor activities. (R. 437-38).

Before the onset of his alleged disability in May 2005, the claimant testified that he worked in the heating and air conditioning industry as a sheet metal mechanic and a service technician. The claimant stated that from 1990 until January 2004, he was a sheet metal mechanic, which involved bidding on projects, installing duct work, and servicing equipment. From January 2004 until April 2005, the claimant testified that he was a service technician, and the claimant was responsible for installing and servicing equipment. The claimant testified that he left employment with his last employer, Air Control and Roofing Incorporated, because he "could not stand the pain of going up and down ladders, crawling in and out of crawlspaces, in attics." The claimant stated that he filed a Workers Compensation claim against his last employer, and that claim has settled. The claimant

testified that he has not worked since May 10, 2005. (R. 438-40).

The claimant testified that his pain starts at "the base of [his] neck, across through both shoulders and at times, it shoots all the way down into [his] hands, [his] wrists[,] especially [his] left wrist . . . ." He also stated that after standing for a long period of time, "[his] left hip [] will start aching." The claimant testified that his average level of pain is five or six on a zero to ten scale. The claimant also stated that Dr. Moon informed him that his MRI of his neck revealed the muscles on either side of his neck were deteriorating. The claimant also testified that he previously had a substance abuse problem with Xanax, but the claimant stated "that's been taken care of" by Dr. Moon switching his Xanax prescription to Klonopin. (R. 433-34, 437, 446-47).

On examination of the claimant by his attorney, the claimant testified that he has difficulty lifting any weight, even a gallon of milk. When asked about his panic attacks, the claimant testified that he has "minor to major" panic attacks "[a]lmost on a daily basis, at least a couple of times a week." The claimant stated that Klonopin, a prescription medication for anxiety, has helped "a little bit." He further testified that he had panic attacks during his employment, and that his employer "would ask [him] what the problem was because [the panic attacks] affected [his] work." (R. 441-43). When asked by the ALJ whether he has ever sought treatment for the panic attacks from a mental health professional, psychiatrist, psychologist, counselor, or a therapist, the claimant stated that he had not because he thought he just has to learn to control the panic attacks himself. (R. 445).

The claimant also testified that he has problems concentrating and remembering things because of his pain. He also stated that he needs to lie down "at least two, three times a day." He even testified that he was having trouble sitting on the day of the ALJ hearing. (R. 444-45).

A vocational expert, Mr. John W. McKinney, III, testified concerning the type and availability of jobs that the claimant is able to perform. He stated that the claimant's past relevant work includes a sheet metal fabricator and a heating and air conditioning unit installer. The ALJ asked Mr. McKinney to assume that the claimant is a person of the claimant's age, education, and past relevant work experience, can perform light work, has no limitations in standing, walking, or sitting, and cannot reach overhead with his right hand and arm. Mr. McKinney responded that under these constraints, the claimant would be precluded from performing past relevant work. (R. 448-49).

The ALJ then asked Mr. McKinney to identify any jobs in the regional or national economy that Mr. McKinney believed the claimant could perform. He replied that the claimant could work as an information clerk, a ticket taker, or an order clerk. The ALJ also asked the vocational expert to assume that "the claimant's testimony is fully credible" and that the claimant must lie down for two to three hours each day. Mr. McKinney responded that under these constraints, "there wouldn't be any type of employment a person could perform or maintain." After the ALJ finished questioning Mr. McKinney concerning the claimant's specific employment opportunities, the claimant's attorney, Mr. Don Bevill, examined Mr. McKinney. (R. 449-51).

Mr. Bevill asked Mr. McKinney about Dr. Moon's assessment that the claimant's absenteeism occurred at a rate of four days per month. Mr. McKinney replied that missing work four times per month is "beyond any acceptable guideline for absenteeism in order to maintain competitive employment." (R. 450-51).

*The ALJ's Decision*

On February 4, 2008, the ALJ issued a decision finding the claimant was not disabled under

the Social Security Act. (R. 15). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (R. 17). However, the ALJ discussed the validity of the allegation that the claimant has not worked since the alleged onset date of his disability. The ALJ found that evidence in the record suggests that the claimant was not truthful regarding his employment after the alleged onset date because physician records indicate that the claimant was working part-time or self-employed after the alleged onset date of disability. (R. 17-18). Next, the ALJ determined that the claimant's left shoulder tendonitis, shoulder degeneration status post right rotator cuff surgery, mild cervical spondylosis, panic disorder, major depressive disorder, pain disorder, and Xanax dependency qualified as severe impairments; he concluded, however, that these impairments did not manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 18-19).

After reviewing all symptoms and the objective medical evidence, the ALJ next determined that the claimant has moderate or less pain and can sustain an eight-hour workday at the light exertional level. The ALJ found that the claimant has no limitations in his ability to sit, stand, and walk. (R. 19). The ALJ also determined that the claimant "has chronic shoulder pain with somatic dysfunction, myofascial pain and dysfunction (mild), and neck pain which have been under an acceptable level of control with conservative medications." (R. 20). The ALJ noted that Dr. Moon's records indicate that the claimant "declined any injections stating that oral medications were controlling his pain and there are no records showing he participated in any formal exercise programs." *Id*. The ALJ also determined that the claimant "sought no emergent or crisis treatment from Dr. Moon." *Id*. Furthermore, the ALJ found that Dr. Ghandi's findings were consistent with

those of the treating physician. *Id*.

In considering the claimant's mental condition, the ALJ concluded that the claimant "has a depressive disorder and panic disorder which are controlled with medication and result in no more than moderate limitations of functioning despite receiving *no* treatment by a mental health professional." (R. 21) (emphasis added). The ALJ also considered the mental health evaluation of Dr. Haney, determining that "the claimant's mental illness has resulted in a mild restriction of daily living activities, moderate difficulty with maintaining social functioning, and moderate difficulty with maintaining concentration, persistence and pace." (R. 22). After considering the claimant's medical evidence, the ALJ concluded that the claimant's impairments "could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id*.

To support his conclusion regarding the claimant's disability, the ALJ determined that the claimant's treatment "has been essentially routine and/or conservative in nature." (R. 23). Furthermore, the ALJ noted that the claimant "was seen only at the time of his regularly scheduled appointments and required no medication changes, denied consideration of any medication changes reporting that he was okay with his medication regimen, and he denied consideration of any injections." *Id*.

The ALJ also noted inconsistencies between the claimant's testimony and the medical evidence. The ALJ determined that the claimant's testimony that Dr. Moon advised the claimant that an MRI revealed that his neck muscles were deteriorating is inconsistent with Dr. Moon's medical records. In addition, the ALJ noted an inconsistency between the claimant's testimony and Dr.

Ghandi's medical records. The claimant testified at the ALJ hearing that Dr. Ghandi advised him to have total replacement surgery of his right shoulder; the ALJ determined, however, that Dr. Ghandi's report does not show such a recommendation. The ALJ also noted inconsistencies regarding the claimant's side effects to various medications. The ALJ found that the claimant denied any medication side effects to his treating physician, Dr. Moon. (R. 24-25).

The ALJ also determined that the claimant's testimony that lifting a gallon of milk with his right arm is painful and with his left arm is sometimes painful, is inconsistent with objective medical evidence. Furthermore, the ALJ found that the claimant's testimony about the need to lie down for two to three hours per day is inconsistent with Dr. Moon's medical records, as well as Dr. Ghandi's report. (R. 25).

The ALJ gave "no weight" to the Functional Assessment (physical), Clinical Assessment of Pain, and Clinical Assessment of Fatigue/Weakness completed by Dr. Moon in May 2006 because those forms were completed based "solely on the subjective report of symptoms and limitations provided by the claimant." (R. 25). Furthermore, the ALJ gave "little weight" to Dr. Blotcky's opinions because Dr. Blotcky is a "non-treating physician who saw the claimant one time at the request of his attorney and had no access to the claimant's medical evidence of record." *Id*. The ALJ concluded that Dr. Blotcky's opinion is inconsistent with "other objective evidence of record." (R. 26). The ALJ did give Dr. Ghandi's opinion "great weight" because "Dr. Ghandi is a board-certified examining source who saw and examined the claimant and reviewed his medical treatment history prior to rendering his opinion."*Id*.

After reviewing the "record as a whole," the ALJ concluded that "the claimant retains the

residual functional capacity to engage in work-related activities at the light level of exertion." *Id*. The ALJ found that the claimant's "subjective complaint of disability, by itself, does not establish disability. Instead, a claimant must produce medical evidence of an underlying impairment that is reasonably likely to be the cause of her alleged impairments." *Id*.

The ALJ agreed with the vocational expert that the claimant's residual capacity "precludes performance of any of his past work." *Id*. The ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 27). Therefore, the ALJ determined that the claimant is not disabled under the Social Security Act. (R. 27-28).

## VI. DISCUSSION

As previously mentioned, this court believes that the claimant argues that the ALJ committed error because the ALJ's decision is not supported by substantial evidence. To the contrary, this court finds that the ALJ properly considered the medical evidence of record and that his opinion should be affirmed.

In this case, the ALJ found that the claimant suffers from impairments that are severe and cause more than minimal limitations on the claimant's ability to engage in work-related activities; however, the ALJ found that the entirety of the medical evidence failed to support the claimant's alleged severity of pain.

The ALJ properly discredited some of the opinions of Dr. Moon, one of the claimant's treating physicians, and clearly articulated his reasons for doing so. The ALJ determined that Dr.

Moon completed assessment forms regarding the claimant's disability, and the ALJ gave these forms "no weight" because "those forms were completed based solely on the subjective report of symptoms and limitations provided by the claimant." (R. 25). The ALJ did conclude from Dr. Moon's records that "Dr. Moon routinely found the claimant to be in no acute distress and he routinely reported average pain of 5-6/10 level." (R. 21). Furthermore, the ALJ noted that "an MRI study of the claimant's cervical spine was consistent with only mild cervical spondylosis." *Id*.

In applying the three-part pain standard, the ALJ determined that "in the absence of medical evidence . . . it is reasonable to conclude that the claimant's diagnosed lumbar and thoracic disk disease has not resulted in any limitations on the claimant's ability to do basic work activities." (R. 18). Furthermore, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 22). Therefore, the ALJ properly applied the three-part pain standard adopted by the Eleventh Circuit and found that the claimant failed to satisfy two parts of the three-part pain standard.

The ALJ properly credited the opinions of Dr. Ghandi, an examining physician, and clearly gave his reasons for doing so. The ALJ found that Dr. Ghandi's findings "are consistent with the above-discussed treating physician records." (R.21). The ALJ accepted Dr. Ghandi's impression that claimant had "right rotator cuff injury status post surgery and left shoulder tendonitis with objective assessment of no more than moderate, 5-6/10, level pain." *Id*.

The ALJ properly discredited the opinions of Dr. Blotcky, a non-treating physician, because

Dr. Blotcky did not have access to the claimant's entire medical record at the time of his examination of the claimant. (R. 25). Dr. Blotcky's examination of the claimant was performed subsequent to the ALJ hearing. Furthermore, the ALJ properly noted that Dr. Blotcky's examination of the claimant was in preparation for the claimant's appeal to this court. The ALJ properly considered the circumstances under which Dr. Blotcky performed his examination of the claimant. (R. 26).

The ALJ properly considered the other medical evidence of record. The ALJ noted that the claimant has never been under the care of a mental health professional. (R. 21-22). The court applies the Eleventh Circuit precedent in this situation and finds that no reason exists in the records for the claimant's failure to seek treatment from a mental health professional. The ALJ, therefore, properly noted such an absence of treatment from a mental health professional. *See Lucas v. Sullivan,* 918 F.2d 1567; *Dawkins v. Bowen*, 848 F.2d 1211.

Furthermore, the ALJ properly credited Dr. Haney's opinions that the claimant is able to respond to supervisors, perform mild one or two-step work-related decisions, and deal with changes in a routine work setting. (R. 21-22). The court agrees that the opinion of an examining consulting physician should not be given the same weight as a treating physician. *MacGregor v .Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (finding that "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight . . . ."). However, the consideration of Dr. Haney's opinion by the ALJ in this particular case was proper, especially the claimant's results from the administration of the WAIS-III, which were indicative of the claimant's ability to respond to commands and pressures in a work environment.

The ALJ properly considered all the medical evidence and found that Drs. Ghandi and

Haney's diagnoses and findings were consistent with the evidence as a whole. Furthermore, the ALJ properly concluded that Dr. Moon's assessments were valid, except in the cases where the findings were based solely on the claimant's subjective statements. Therefore, good cause and substantial evidence exist to support the ALJ's decision.

## VII. CONCLUSION

For the reasons stated above, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 12th day of August 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE